# EXHIBIT A-1

**Post-Petition Payment History**

| PAYMENT DUE DATE | AMOUNT DUE | DATE PAYMENT RECEIVED | AMOUNT RECEIVED | DATE PAYMENT APPLIED | AMOUNT APPLIED TO PRINCIPAL | AMOUNT APPLIED TO INTEREST | AMOUNT APPLIED TO ESCROW | TOTAL AMOUNT APPLIED | SUSPENSE |
|---|---|---|---|---|---|---|---|---|---|
| No payments received since date of bankruptcy filing. | | | | - | - | - | - | $0.00 | $0.00 |
| TOTAL: | $0.00 | | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Loan # [REDACTED]

# FIXED RATE NOTE



| MARCH 31, 2006 | PASADENA | CALIFORNIA |
|:---:|:---:|:---:|
| [Date] | [City] | [State] |

173 PEBBLE BEACH DRIVE
SLIDELL, LA 70458

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 251,500.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
INDYMAC BANK, F.S.B.,
a federally chartered savings bank
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

This Note, as amended by the attached Residential Construction Loan Addendum Amending Note (the "Addendum"), represents both a construction/home improvement loan and a permanent mortgage loan. During the Construction Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note and ending on the first day of the month preceding the due date of the first monthly payment of principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will be in default under the Addendum and under this Note. If Completion has occurred prior to the Permanent Loan Commencement Date, then the loan evidenced by this Note will automatically become a permanent mortgage loan on the Permanent Loan Commencement Date, and the provisions of the Addendum will cease to be in effect and all terms and conditions of the loan will be as set forth in this Note on the Permanent Loan Commencement Date.

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        7.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the        1ST        day of each month beginning on        NOVEMBER, 2006        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on        OCTOBER 01, 2036        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 155 NORTH LAKE AVENUE
PASADENA, CA 91101        or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,823.55        .

IndyMac Bank
Construction-to-Perm Fixed Rate Note - Multistate

8480307 (0112)        VMP MORTGAGE FORMS - (800)521-7291        01/02
DDS-HC1

*BD*

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A) Late Charge for Overdue Payments**

    If the Note Holder has not received the full amount of any monthly payment by the end of     **15**    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B) Default**

    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C) Notice of Default**

    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D) No Waiver By Note Holder**

    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E) Payment of Note Holder's Costs and Expenses**

    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

8480307 (0112)
DDS-HC1

Page 2 of 3

HCL 917
01/02

*BD*

#### 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

#### 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
BRIAN J. DOMINGUE                -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                      -Borrower

"NE VARIETUR" for Identification with an Act of
Mortgage passed before the above signed witnesses
and me, Notary, this _____ day of
_____

_____ Notary Public
My commission expires: At My Death

Hope Lambert
Notary Public
Parish of St. Tammany
State of Louisiana
My commission is for life
Notary ID # 80483

*[Sign Original Only]*

Pay To The Order Of

Without Recourse
IndyMac Bank, F S B
By:
_____
Vartan Derbedrossian
Vice President

HCL 917
01/02

DDS-HCL (0112)        Page 3 of 3

DATE: March 31, 2006        LOAN #: ▇▇▇▇▇▇▇▇▇

## RESIDENTIAL CONSTRUCTION LOAN
## ADDENDUM AMENDING NOTE
### (Multistate)

THIS Addendum is incorporated into and shall be deemed to amend and supplement the Note ("Note"), of even date herewith, given by the undersigned Borrower ("Borrower" whether one or more) to evidence Borrower's indebtedness to the Note Holder, which indebtedness is secured by that certain Security Instrument, of even date herewith, covering the premises described in the Security Instrument. Notwithstanding anything to the contrary set forth in the Note, Borrower hereby agrees to the following:

**1. CONSTRUCTION/PERMANENT LOAN**

This Note, as amended, represents both a construction/home improvement loan and a permanent mortgage loan. During the Construction Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note and ending on the first day of the month preceding the due date of the first monthly payment of principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will be in default under this Addendum and under the Note. If Completion has occurred prior to the Permanent Loan Commencement Date, then the loan evidenced by the Note will automatically become a permanent mortgage loan on the Permanent Loan Commencement Date, and the provisions of this Addendum will cease to be in effect and all terms and conditions of the loan will be as set forth in the Note on the Permanent Loan Commencement Date.

**2. INTEREST**

**(A) Interest During the Construction Period**

I will pay interest only on the amount advanced at the yearly rate of 7.875%. Note Holder will calculate interest by applying a daily interest rate (determined by dividing the yearly rate by 360) to the actual outstanding balance for each day (calculating each day's outstanding balance by taking the beginning balance for that day and adding any advances made that day and subtracting any payments received or credits for that day) in the billing period, and by adjusting each billing period to equal 30 days as follows: (i) for billing periods of 31 days, Note Holder will calculate interest only for the first 30 days and will ignore the 31st day, and (ii) for a billing period of 28 or 29 days, Note Holder will calculate interest for the first 28 or 29 days in the normal manner, and will calculate interest for the remaining one or two days of the adjusted 30-day billing period by treating the outstanding balance on the last day of the billing period as the outstanding balance for such remaining one or two days of the billing period. Note Holder will calculate the interest due for each month and will mail to me a statement of the amount of interest due. I can determine the amount of interest due at any time by calling the number given to me for such inquiries by the Note Holder or Note Holder may permit me to access an internet site designated by the Note Holder for such information. I will make payments each month in the amount of the interest accrued for the prior month on or before the first (1st) day of each month. Interest will accrue on a daily basis until payment is received, and all accrued but unpaid interest for the Construction Period shall be due and payable on the Permanent Loan Commencement Date. I agree that to the extent the Loan Budget Worksheet/Line Item Cost Breakdown, as defined in the Residential Construction Loan Agreement, includes undisbursed funds allocated to interest reserve, Note Holder is authorized, in its discretion, to establish a interest reserve from the proceeds of the loan evidenced by the Note, or from the borrower's Funds Account (as defined in the Residential Construction Loan Agreement), the amount of which interest reserve shall be established by Note Holder in its sole and absolute discretion, and Note Holder shall use such interest reserve to pay interest on the Note as it becomes due. I may, in my sole option, pay accrued interest each month by check made payable directly to Note Holder, but in the event such payment is not received from me by the scheduled payment date, I will be deemed not to have exercised such option for such interest payment, and Note Holder shall pay such interest payment from the interest reserve. Amounts advanced by Note Holder from the interest reserve shall accrue interest at the rates from time to time in effect hereunder.

**IndyMac Bank**
**Residential Construction Loan Addendum Amending Note - Multistate**
Page 1 of 3      **HCL 910**
▇▇▇▇▇▇03121      VMP Mortgage Solutions (800)521-7291      **12/03**
DDS-CR1

*BD*

**(B)  Option to Choose Alternative Permanent Product**

I have a one-time option to choose an alternative permanent loan product at any time during the 30-day period immediately preceding the Permanent Loan Commencement Date if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement and if there is no default under the Note, this Addendum or the Residential Construction Loan Agreement. If I choose to exercise this option, I may select another permanent phase loan product offered at the time I choose to exercise the option at the rates and under the terms and conditions that product is then being offered. If I exercise this option, I will sign a loan modification agreement and, if requested by Note Holder, a new Note reflecting the terms and conditions of the product that I have chosen. I understand that the terms and conditions, including interest rates of products that are offered change from time to time, and the terms and conditions, including interest rates of products that are offered at the time my option is effective may not be as attractive to me as the terms and conditions, including interest rates of products that are available at the time I sign this Addendum. If I want to exercise this option, I will notify the Note Holder in writing prior to the end of my option period, and if I do not so notify the Note Holder or if I fail for any reason to execute the required modification documents prior to the end of my option period, then the original terms and conditions of the Note will be the terms and conditions of the permanent phase of my loan beginning on the Permanent Loan Commencement Date.

**3.  ADVANCES**

In the event Completion has not occurred for any reason prior to the required Completion Date specified in the Residential Construction Loan Agreement, I will be in default under the Note and this Addendum, and the Note Holder may choose any of the remedies available to it under applicable law. In such event, however, Note Holder shall have the option, in its sole and absolute discretion, to permit the loan to convert to a permanent loan as follows: (i) Note Holder shall make any remaining advances of construction funds under the Residential Construction Loan Agreement into an escrow or pledge account established for such purpose, (ii) funds may be transferred from such escrow or pledge account to the Direct Cost Disbursement Account upon Note Holder's approval and in accordance with Note Holder's instructions and upon satisfaction of any conditions for such disbursement in accordance with the Residential Construction Loan Agreement, (iii) the terms and conditions of the Residential Construction Loan Agreement shall continue until Completion has occurred, (iv) I will make payments of principal and interest on the entire amount advanced (not just on the amount disbursed) beginning on the scheduled Permanent Loan Commencement Date as if Completion had occurred as scheduled. Note Holder may require me to sign any documents it deems necessary or appropriate to effect such an arrangement, including documents granting Note Holder a security interest in the funds advanced, as a condition to agreeing to permit the conversion of my loan to a permanent loan.

**4.  LATE CHARGES**

If the Noteholder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Noteholder. The amount of the charge will be 5.000 % of my overdue payment. I will pay this late charge promptly but only once on each late payment.

**5.  EVENTS OF DEFAULT AND ACCELERATION OF THE DEBT**

Note Holder may declare the entire unpaid principal balance and accrued interest due and payable under the terms of the Note, as amended by this Addendum if any payment of interest is not made when due during the Construction Period or if default should occur under any covenant, condition or agreement contained in the Loan Documents. The definition of Loan Documents includes the Note, as amended by this Addendum, Security Instrument securing the Note as amended and the Residential Construction Loan Agreement.

**6.  CONFLICTS**

If any term or provision of this Addendum shall be in conflict with any term or provision of the Note, the term or provision of this Addendum shall control. This Addendum shall be interpreted under the laws of LOUISIANA          .
Any provisions of this Addendum adjudged to be invalid shall be deemed amended from it, with the remainder of the provisions to be in full force and effect. Any remedies or rights of Note Holder expressed in this Addendum are cumulative of, and not exclusive of any other remedies and rights. Except as amended or supplemented hereby, the terms and provisions of the above referenced Note shall remain unchanged and in full force and effect.


*BD*

7.   **TERMINATION**

After the advance of all funds as necessary to complete the improvements, completion of the improvements, and the satisfaction of all conditions as described in the Residential Construction Loan Agreement, this Addendum will be null and void and no longer in effect, and any funds remaining in any construction account will be refunded to the Borrower or credited to the principal balance.

8.   **NOTICE OF NO ORAL AGREEMENT**

The written Loan Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Addendum.

EXECUTED this _31st_ day of _March, 2006_

MAR 3 1 2006

| | |
|---|---|
| X _Brian J Domingue_ | |
| Borrower | Date |
| BRIAN J. DOMINGUE | |

| | |
|---|---|
| | |
| Borrower | Date |

| | |
|---|---|
| | |
| Borrower | Date |

| | |
|---|---|
| | |
| Borrower | Date |

*[Sign Original Only]*

Return To:
INDYMAC BANK, F.S.B.
3465 EAST FOOTHILL BLVD./ATTN: DOCUMENT MANAGEMENT
PASADENA, CA  91107

Prepared By:
INDYMAC BANK, F.S.B.
3465 EAST FOOTHILL BLVD.
PASADENA, CA  91107

St. Tammany Parish 1629
Instrmnt #: 1545553
Registry #: 1564154 LCH
04/05/2004 11:27:00 AM
MB X CB    MI    WCC

—————————————————[Space Above This Line For Recording Data]—————————————————

# MORTGAGE

Loan Number: ▮▮▮▮▮▮▮

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 31, 2006
together with all Riders to this document.

LOUISIANA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Ⓥ -6(LA) (0308)
Page 1 of 15                    Initials: _____
    VMP Mortgage Solutions (800)521-7291
008-LAV

Form 3019  1/01

*BD MB*

STATE OF LOUISIANA PARISH OF ST. TAMMANY
I HEREBY CERTIFY that the above is a true and
correct copy of the original as recorded at
instrument # _1545553_ of the original
records. Given under my hand and seal of office
this the __5__ day of _April_ , 20_0P_
_Fay J. Kelly_
Dy. Clerk and Ex-Officio Recorder

(B) "Borrower" is

BRIAN J. DOMINGUE AND MICHELLE BENTON DOMINGUE, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is
INDYMAC BANK, F.S.B.
Lender is a a federally chartered savings bank
organized and existing under the laws of THE UNITED STATES OF AMERICA
Lender's address is 155 NORTH LAKE AVENUE
PASADENA, CA 91101
Lender's tax identification number is ███████████ . Lender is the mortgagee under this
Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated March 31, 2006
The Note states that Borrower owes Lender Two Hundred Fifty-One Thousand Five Hundred & 00/100
(U.S. $251,500.00             ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 01, 2036

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. All Riders to this Security Instrument are deemed to be a part of this Security Instrument as if fully incorporated herein. The following Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] V.A. Rider

- [ ] Condominium Rider
- [X] Planned Unit Development Rider
- [ ] Biweekly Payment Rider

- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [X] Other(s) [specify]
  Construction Rider
  *Exhibit "A"*

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(VMP) -6(LA) (0308)
DDS-LAV

Page 2 of 16

Initials: _____

Form 3019  1/01

*BD MD*

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the                               Parish                        [Type of Recording Jurisdiction]
of            SAINT TAMMANY                    [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF, *EXHIBIT A*

Municipal Number:                                                        which currently has the address of
173 PEBBLE BEACH DRIVE                                                                                    [Street]
SLIDELL                                                       [City] , Louisiana        70458        [Zip Code]
("Property Address"):

VMP -6(LA) (0309)                              Page 3 of 18                Initials: _____        Form 3019   1/01
DDS-LAV

*BD   MD*

## EXHIBIT "A"

THAT CERTAIN LOT OR PORTION OF GROUND, situated in the Parish of St. Tammany, Stated of Louisiana, in that part thereof known as EDEN ISLES SUBDIVISION, UNIT 5, PHASE 1, being LOT NUMBER THIRTY-SEVEN (37), according to a map or plat of survey by Albert A. Lovell, C.E., dated May 22, 1974, formerly map or plat file No. 1702, now map or plat file no. 98A, 98B, and 98D of the official records of St. Tammany Parish, Louisiana. said property is further delineated on plat of survey No. 77-070 by Albert A. Lovell, C.E., dated September 6, 1976, and revised April 14, 1977.

Marital Status: BRIAN J. DOMINGUE, married to Michelle Benton Domingue , dealing with seperate property,

_BD MD_

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and hypothecate the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

BD   MD

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

BD MD

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

 -6(LA) (0308)
DDS-LAV

Page 6 of 15

Initials: _____

Form 3019 1/01

BD MD

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's

*BD MD*

knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's

-6(LA) (0300)
DDS-LAV

Page 8 of 16

Initials: _____

Form 3019 1/01

BD MD

requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless

BD  MD

Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the

DDS-LAV

BD  MD

reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited

BD MD

to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

BD MD

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Notice of Default; Right to Cure. Lender shall give notice to Borrower prior to acceleration following Borrower's failure to pay principal, interest, and other fees and charges as provided in the Note, or following Borrower's breach of any covenant or agreement in this Security Instrument. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and the sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure as available under Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may accelerate and require immediate payment in full of all sums secured by this Security Instrument without further demand for payment.

23. Foreclosure. Following Lender's acceleration of payment, Lender may commence appropriate foreclosure proceedings under this Security Instrument under ordinary or executory process, under which Lender may cause the Property to be immediately seized and sold, with or without appraisal, in regular session of court or in vacation, in accordance with Applicable Law. For purposes of foreclosure under executory process procedures, Borrower confesses judgment and acknowledges to be indebted to Lender for all sums secured by this Security Instrument, in principal, interest, costs, expenses, attorneys' fees and other fees and charges. To the extent permitted by Applicable Law, Borrower waives: (a) the benefit of appraisal as provided in Articles 2332, 2336, 2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sales; (b) the demand and three days' delay as provided in Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (c) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (d) the three days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (e) all other benefits provided under Articles 2331, 2722 and 2733 of the Louisiana Code of Civil Procedure and all other articles not specifically mentioned above. Borrower agrees that any declaration of fact made by an authentic act before a notary public and two witnesses by a person declaring such facts to be within his or her knowledge, will constitute authentic evidence of such facts for purposes of foreclosure under Applicable Law and for purposes of La. R.S. Section 9:3504(D)(6).

24. Cumulative Remedies. Lender shall have such additional default remedies as may be available under then Applicable Law. All of Lender's remedies shall be cumulative, and nothing under this Security Instrument shall limit or restrict the remedies available to Lender following default.

25. Keeper. Should the Property be seized as an incident to an action for recognition or enforcement of this Security Instrument by executory process, sequestration, attachment, writ of *fieri facias*, or otherwise, Borrower agrees that the court issuing such an order shall, if requested by Lender, appoint Lender, or any person or entity designated by Lender, as keeper of the Property as provided in La. R.S. Section 9:5136, *et. seq.* Borrower agrees to pay the reasonable fees of such a keeper, which fees shall be secured by this Security Instrument as an additional expense.

Initials: _____

*BD  MD*

26. **Cancellation.** This Security Instrument shall remain in effect until canceled from the public records. Following the full payment and satisfaction of all sums secured by the Security Instrument, Borrower may request in writing that Lender provide Borrower with the original paraphed Note marked "paid in full", or with an appropriate mortgage cancellation certificate, for submission to the Clerk of Court or Recorder of Mortgages for the Parish of Orleans for the purpose of canceling this Security Instrument. Lender may delay providing Borrower with the canceled Note or with a mortgage cancellation certificate for up to 60 days following Lender's receipt of Borrower's request. Unless Lender agrees to cancel this Security Instrument from the public records, Borrower shall be responsible for doing so. Borrower shall pay all cancellation costs.

27. **Waiver of Homestead Rights.** Borrower (and Borrower's spouse to the extent applicable) waive any homestead rights and other exemptions from seizure with respect to the Property as may be provided under Applicable Law.

28. **Savings and Loan Association.** If Lender is a savings and loan association or thrift institution, the Note and all sums secured by this Security Instrument shall have the benefits of La. R.S. Section 6:830.

29. **Future Advances.** Lender may, but shall not be required to, make advances to protect the security of this Security Instrument pursuant to Section 9. At no time shall the principal amount of the indebtedness secured by this Security Instrument, including advances made pursuant to Section 9, exceed 150% of the original amount of the indebtedness set forth in the Note.

30. **Late Charges.** Should Borrower fail to pay any installment of principal and interest under the Note within          15          days of when due, Borrower agrees to pay Lender a late charge in an amount equal to 5.000%.

31. **Marital Status.** Borrower's marital status is: See Definition B

32. **Additional Defined Terms.** As used in this Security Instrument, "Lender" additionally includes any successors and assigns of the Lender first named above, as well as any subsequent holder or holders of the Note, or of any indebtedness secured by this Security Instrument.

As used in this Security Instrument, "Note" additionally includes any substitute note or notes issued in replacement of Note first described above. It is Borrower's intent that this Security Instrument secure all renewals, extensions, refinancings, and modifications of the Note, to the extent provided by La. R.S. Section 9:5390.

As used in this Security Instrument, "Lien" also means a privilege, mortgage, security instrument, assignment or other encumbrance. "Real Property" means "immovable property" as that term is used in the Louisiana Civil Code. "Condemnation" includes "expropriation" as that term is used in Louisiana law.

33. **Property Includes Servitudes and Component Parts.** The Property subject to this Security Instrument additionally includes servitudes and component parts now or hereafter attached to or incorporated into the Property.

34. **Full Ownership.** Borrower is the full and lawful owner of the Property. If the Security Instrument is on a leasehold interest, and Borrower subsequently acquires ownership of the Property, Borrower's leasehold and ownership interests in the Property shall not merge unless Lender agrees to the merge in writing.

35. **Modification of Section 13 of this Security Instrument.** Section 13 of this Security Instrument is hereby modified to the following extent.

Each Borrower covenants and agrees that Borrower's obligations and liabilities under this Security Instrument and under the Note shall be joint, several and solidary with all other Borrowers and with each guarantor of the Note (if applicable). However, to the extent that the Property is community-owned immovable (real) property, and Borrower's spouse co-signs this Security Instrument, but does not co-sign the Note, Borrower's spouse is co-signing this Security Instrument for purpose of: (a) concurring with the granting of this Security Instrument on the community-owned Property (to the extent required under Civil Code Article 2347),

-6(LA) (0309)
DDS-LAV

Initials: _____

Page 14 of 15

Form 3019  1/01

BD MD

without obligating the separate property of Borrower's spouse; and (b) waiving any homestead rights to which Borrower's spouse may be entitled under Applicable Law. Notwithstanding the fact that Borrower's spouse did not co-sign the Note, and further notwithstanding the language of Section 13 of this Security Instrument, Borrower's spouse is obligated for payment of the Note and all other sums secured by this Security Instrument to the extent of the spouse's community property interest, and to the extent that the Note is a community obligation.

36. **Additional Waivers.** Borrower hereby waives production of mortgage, conveyance and other certificates with respect to the Property, and relieves and releases the Notary Public before whom this Security Instrument was passed from all responsibility and liability in connection therewith.

THUS DONE, AND PASSED, on this _31st_ day of _March, 2006_ , in the presence of the undersigned Notary Public, and in the presence of the undersigned competent witnesses, who hereunto sign their names, along with Borrower, after being duly sworn and after reading of the whole.

WITNESS(ES) (as to all signatures):

_Elaine Muller_
Elaine Muller

_Brittney Pichon_
BRITTNEY PICHON

_Brian J. Domingue_ (Seal)
BRIAN J. DOMINGUE                          -Borrower

_Michelle Benton Domingue_ (Seal)
MICHELLE BENTON DOMINGUE          -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_Hope Lambert_

Notary qualified in  STATE of LOUISIANA
ST TAMMANY Parish, Louisiana
Notary Identification Number # 80483

Hope Lambert
Notary Public          Form 3019  1/01
Parish of St. Tammany
State of Louisiana
My commission is for life
Notary ID # 80483

VMP -6(LA) (0309)
DOS-LAV

# PLANNED UNIT DEVELOPMENT RIDER

Loan Number ███████████

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 31st day of March, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

INDYMAC BANK, F.S.B.,
a federally chartered savings bank
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

173 PEBBLE BEACH DRIVE
SLIDELL, LA 70458
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

THE DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS.

(the "Declaration"). The Property is a part of a planned unit development known as

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01

Page 1 of 3          Initials: _____

VMP-7R (0411)          VMP Mortgage Solutions, Inc. (800)521-7291
DDS-C07

BD MD

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

-7R (0411)  Page 2 of 3  Form 3150 1/01
DDS-C07

BD MD

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
-Borrower
BRIAN J. DOMINGUE

_____ (Seal)
-Borrower
MICHELLE BENTON DOMINGUE

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

VMP-7R (0411)
DDS-C07

Page 3 of 3

Form 3150 1/01

TO BE RECORDED WITH THE SECURITY INSTRUMENT

Loan # ███████        Date: March 31, 2006

## RESIDENTIAL CONSTRUCTION LOAN RIDER
### (Louisiana)

Words used in this Rider are defined below. Words in the singular mean and include the plural and vice versa.

"Agreement" means the Residential Construction Loan Agreement.

"Borrower" is

BRIAN J. DOMINGUE AND MICHELLE BENTON DOMINGUE

"Borrower's Funds Account" means any and all construction loan accounts established pursuant to the Agreement and held by Lender and used to deposit additional funds provided by Borrower.

"Contractor" is

and its successors or assigns.

"Improvements" are the improvements made to a single family residence *or new construction of a single family residence.*

"Lender" is INDYMAC BANK, F.S.B.,
a federally chartered savings bank
and its successors or assigns.

"Loan" means the debt evidenced by the Note and all sums due under the Security Instrument and the Agreement.

"Loan Documents" means the Agreement, the Note, the Security Instrument, all other documents now or hereafter executed by borrower or any other person or party to evidence or securing the loan, and any and all renewals, reinstatements, extensions, amendments thereto or substitutes given therefor.

"Note" means the promissory note of even date signed by Borrower in favor of Lender.

"Property" means the property commonly known as
173 PEBBLE BEACH DRIVE
SLIDELL, LA 70458

IndyMac Bank, F.S.B.
Residential Construction Loan Rider to Security Instrument - Louisiana

Page 1 of 6                                                   HCL 911(LA)
█████ (502)      VMP Mortgage Solutions, Inc. (800)521-7291                    2/05
OCS-CR2

*BD  MD*

"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument of even date signed by Borrower in favor of Lender.

THIS RESIDENTIAL CONSTRUCTION LOAN RIDER shall be deemed to amend and supplement the Security Instrument of the same date given by the Borrower to secure Borrower's Note to Lender of the same date and covering the Property described in the Security Instrument.

AMENDED AND ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1.     **Residential Construction Loan Agreement.** Borrower agrees to comply with the covenants and conditions of the Agreement between Borrower, Lender and Contractor, which is incorporated herein by this reference and made a part of this Security Instrument. The Agreement provides for the construction of certain Improvements on the Property. All advances made by Lender pursuant to the Agreement shall be an indebtedness of Borrower secured by this Security Instrument as amended, and such advances may be obligatory under the terms of the Agreement. The Security Instrument secures the payment of all sums and the performance of all covenants required by Lender in the Agreement. Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Agreement, the principal sum and all interest and other charges provided for in the loan documents and secured hereby shall, at the option of the Lender, become due and payable.

2.     **Security Instrument.** This Security Instrument is a "construction mortgage" securing an obligation incurred for the construction of Improvements on the Property including the acquisition cost of the Property, if any, and any notes issued in extension, renewal, or substitution thereof. Borrower affirms, acknowledges and warrants that prior to the recordation of this Security Instrument, as amended, in the appropriate Mortgage Records of the State of Louisiana, no Improvements contemplated by the Loan Agreement have been constructed, no work has been performed, and no materials have been ordered or delivered.

3.     **Future Advances.** This Security Instrument shall secure in addition to the sum evidenced by the Note all funds hereafter advanced by Lender to or for the benefit of Borrower, as contained in the Contract and/or the Agreement for the construction of Improvements on the mortgaged property or for any other purpose. All future advances shall be made within the time limit authorized by the laws of this state. To the extent that moneys advanced by Lender are used to pay for the costs of acquiring the Property, this mortgage shall be a purchase money security interest.

4.     **Disbursements to Protect Security.** All sums disbursed by Lender prior to completion of the Improvements to protect the security of this Security Instrument, up to the principal amount of the Note and any future advances, shall be treated as disbursements pursuant to the Agreement. All such sums shall bear interest from the date of disbursement at the rate stated in the Note, unless the collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law and shall be payable upon notice from Lender to Borrower requesting payment therefore.

ODS-DR2    (0502)                    Page 2 of 6                                      HCL 911(LA)
                                                                                     2/05

BD  MD

5.     **Assignment of Rights or Claims.** From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property.

6.     **Breach by Borrower.**

a.  Upon the occurrence of a breach under any of the Loan Documents, Lender at its option, may (a) declare all sums owing under the Agreement, the Note and the other Loan Documents immediately due and payable; (b) disburse and incur such expenses to preserve the Property and Improvements as security; (c) terminate its commitment to lend and any obligation to make any further disbursements of the Loan; (d) set-off and apply, to the extent thereof and to the maximum extent permitted by law, any and all deposits, funds or assets at any time held and any and all indebtedness at any time owing by Lender to or for the credit or account of Borrower against the Loan; (e) exercise any and all rights and remedies afforded by the Security Instrument, the Agreement, the other Loan Documents, law, equity or otherwise; and (f) in its own name or in the name of Borrower, enter into possession of the Property, perform all work necessary to complete the construction of the Improvements substantially in accordance with the plans and specifications (as modified as deemed necessary by Lender), the Loan Documents, laws, and governmental requirements, and continue to employ any contractor or subcontractor pursuant to applicable contracts or otherwise. The remedies provided in this Paragraph shall be in addition to other remedies provided by law, equity, or the Loan Documents.

b.  All costs and expenses paid or incurred by Lender pursuant to the foregoing subparagraph of this paragraph shall be deemed to be advanced to Borrower and shall be a part of the indebtedness evidenced by the Note and secured by the Security Instrument. At the option of Lender, such sums may be deducted from any advance thereafter becoming due.

c.  Nothing herein contained shall be deemed to waive any right given to Lender pursuant to the applicable law relating to mechanic's, artisan's and materialman's liens.

7.     **Termination of Agreement upon Amortization.** After the commencement of amortization of the Note, the terms of the Agreement (except to the extent Lender is indemnified therein) shall be null and void, and there shall be no claim or defense arising out of or in connection with the Agreement against the obligations of the Note and this Security Instrument.

8.     **Property.** The property covered by this Security Instrument includes the property described or referred to in this Security Instrument, together with the following, all of which are referred to as the "Property." The portion of the Property described below which constitutes real property is sometimes referred to as the "Real (<u>Immovable</u>) Property." The portion of the Property which constitutes personal property is sometimes referred to as the "Personal (<u>Movable</u>) Property," listed as follows:

Any and all buildings, improvements (provided in the Agreement or otherwise), <u>structures, other constructions,</u> and tenements now or hereafter erected on the Property, any and all heretofore and hereafter vacated alleys and streets abutting the Property, <u>servitudes,</u> easements, <u>rights of use,</u> rights,

HCL 911(LA)

Page 3 of 6

2/05

DDS-DR2

*BD*   *MD*

appurtenances, rents (subject however to any assignment of rents to Lender), leases, royalties, mineral, oil and gas rights and profits, water, water rights and water stock appurtenant to the Property (to the extent they are included in Borrower's fee simple title); any and all component parts, integral parts, fixtures, machinery, equipments, building materials, appliances, and goods of every nature whatsoever now or hereafter located in, or on, or used, or intended to be used in connection with the Property and all replacements and accessions of them, including, but not limited to those for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air and light; security and access control apparatus; plumbing and plumbing fixtures; refrigerating, cooking and laundry equipment; carpet, floor coverings and interior and exterior window treatments; furniture and cabinets; interior and exterior sprinkler plant and lawn maintenance equipment; fire prevention and extinguishing apparatus and equipment, water tanks, swimming pool, compressor, vacuum cleaning system, disposal, dishwasher, range, and oven, any shrubbery and landscaping; any and all plans and specifications for development of or construction of Improvements upon the Property; any and all contracts and subcontracts relating to the Property; any and all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions related to the Property; any and all permits, licenses, franchises, certifications, and other rights and privileges obtained in connection with the Property; any and all products and proceeds arising from or by virtue of the sale, lease, or other disposition of any of the Property; any and all proceeds payable or to be payable under each policy of insurance relating to the Property; any and all proceeds arising from the taking of all or part of the Property for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof; all building permits, certificates of occupancy, certificates of compliance, any right to use utilities of any kind including water, sewage, drainage and any other utility rights, however arising whether private or public, present or future, including any reservation, permit, letter, certificate, license, order, contract or otherwise and any other permit, letter, certificate, license, order, contract or other documents or approval received from or issued by any governmental entity, quasi-governmental entity common carrier, or public utility in any way relating to any part of the Property or the Improvements, fixtures and equipments thereon; all other interests of every kind and character which Borrower now has or at any time hereafter acquires in and to the Property, including all other items of property and rights described elsewhere in this Security Instrument.

The Personal Property also includes the Borrower's Funds Account, together with any interest accruing thereon and proceeds thereof.

9. **Completion.** Lender shall not be responsible for the completion of the Improvements, and shall not in any way be considered a guarantor or surety of performance by Borrower. In the event the Improvements are not completed according to the plans and specifications approved by Lender, and it is determined for whatever reason the Lender does not have a lien arising by or through Borrower, then Lender shall have a valid lien for its loan amount, less the amount reasonably necessary to complete the Improvements, or in such event Lender, at its option, shall have the right to complete the Improvements, and the lien shall be valid for the loan amount.

HCL 911(LA)
2/05

DDS-DR2

BD MD

10.  **Invalid Provisions.** If any provision of this Security Instrument is declared invalid, illegal, or unenforceable by a court of competent jurisdiction, then such invalid, illegal or unenforceable provision shall be severed from this Security Instrument and the remainder enforced as if such invalid, illegal or unenforceable provision is not a part of this Security Instrument.

11.  **Address.**

The name and address of the Borrower/Debtor during construction of the Improvements is:  BRIAN J. DOMINGUE AND MICHELLE BENTON DOMINGUE

129 NOTTINGHAM DRIVE
SLIDELL, LA 70458

The name and address of the Lender/Secured Party is:

INDYMAC BANK, F.S.B.,
a federally chartered savings bank
155 NORTH LAKE AVENUE
PASADENA, CA 91101

12.  **Other Provisions.** The following notice is required by law:

IMPORTANT NOTICE: YOU ARE HEREBY NOTIFIED THAT ANY PERSON PERFORMING LABOR ON YOUR PROPERTY OR FURNISHING MATERIALS FOR THE CONSTRUCTION, REPAIR, OR IMPROVEMENT OF YOUR PROPERTY WILL BE ENTITLED TO A LIEN AGAINST YOUR PROPERTY IF HE IS NOT PAID IN FULL, EVEN THOUGH YOU MAY HAVE PAID THE FULL CONTRACT PRICE TO YOUR CONTRACTOR. THIS COULD RESULT IN YOUR PAYING FOR LABOR AND MATERIALS TWICE. THIS LIEN CAN BE ENFORCED BY THE SALE OF YOUR PROPERTY. TO AVOID THIS RESULT, YOU MAY DEMAND FROM YOUR CONTRACTOR LIEN WAIVERS FROM ALL PERSONS PERFORMING LABOR OR FURNISHING MATERIALS FOR THE WORK ON YOUR PROPERTY. YOU MAY WITHHOLD PAYMENT TO THE CONTRACTOR IN THE AMOUNT OF ANY UNPAID CLAIMS FOR LABOR OR MATERIALS. YOU ALSO HAVE THE RIGHT TO DEMAND FROM YOUR CONTRACTOR A COMPLETE LIST OF ALL LABORERS AND MATERIAL SUPPLIERS UNDER YOUR CONTRACT, AND THE RIGHT TO DETERMINE FROM THEM IF THEY HAVE BEEN PAID FOR LABOR PERFORMED AND MATERIALS FURNISHED.

005-082

Page 5 of 6

HCL 911(LA)
2/05

BD MD

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Residential Construction Loan Rider.

_____ (Seal)
BRIAN J. DOMINGUE                   -Borrower

_____ (Seal)
MICHELLE BENTON DOMINGUE       -Borrower

_____ (Seal)
                                             -Borrower

_____ (Seal)
                                             -Borrower

———————————[Please See Attached Acknowledgment(s)]———————————

DOS-OR2

Page 6 of 6

HCL 911(LA)
2/05

State of LOUISIANA
Parish of ST. TAMMANY

**NOTARIAL ENDORSEMENT AND
ASSIGNMENT OF MORTGAGE NOTE AND MORTGAGE**

**Loan #** ███████

Be it known that on 01/21/2010, before me, the undersigned Notary Public in and for the State of FLORIDA, county of PINELLAS, personally came and appeared BRYAN BLY, ATTORNEY-IN-FACT of **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B., WHOSE ADDRESS IS 6900 BEATRICE DR. , KALAMAZOO, MI 49009, (ASSIGNOR)**, and who, upon appearing on behalf of the said corporation and duly authorized by resolution of the Board of Directors of said corporation, declared: That for value received, the said **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B.** does hereby assign, transfer, sell and deliver, without recourse, to: **OneWest Bank, FSB, WHOSE ADDRESS IS 888 E. WALNUT STREET , PASADENA, CA 91101, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE)** one certain mortgage note made and subscribed by **BRIAN J. DOMINGUE AND MICHELLE BENTON DOMINGUE HUSBAND AND WIFE** which mortgage note is secured by a mortgage of as described herein, executed by the same parties, and so paraphed by a Notary Public, n/a Parish, Louisiana, on 03/31/2006 recorded under Registry 1545553 or in Book  at Page , covering property known as 173 PEBBLE BEACH DR SLIDELL, LA 70458 situated in ST. TAMMANY Parish and more particularly described in such mortgage.

SEE ATTACHED EXHIBIT A
That the said "assignor" is the legal and equitable owner of the said note and mortgage with full power to sell and assign the same; that it has executed no prior assignment or pledge thereof; that it has executed no release, discharge, satisfaction or cancellation of said mortgage; that it has executed no release of any portion of any of the security described in said mortgage; and, that it has executed no instrument of any kind affecting the mortgage or the note or the liability of the maker or makers thereof.

This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in any capacity.

This signed in my office, in the aforementioned county and state, on the date first hereinabove written, in the presence of the undersigned competent witnesses, who have signed with said appearer and me, Notary, after due reading of the whole.
01/21/2010
FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B.

By:_____
BRYAN BLY
ATTORNEY-IN-FACT

_____
VILMA CASTRO   WITNESS

_____
CRYSTAL MOORE Notary Public
Commission expires: 09/23/2013

St. Tammany Parish 2183
Instrmnt #: 1769820
Registry #: 1989784 sfc
06/01/2010 8:30:00 AM
MB X CB   MI   UCC

Prepared by: Jessica Fretwell/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
When Recorded Return To:
OneWest Bank, FSB
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683



CRYSTAL MOORE
Notary Public, State of Florida
Commission # DD
Expires September 23, 2013
Bonded Through National Notary Assn.

OWBA█

form5/FRMLA1

C:\KW\2459438\006_▮▮▮▮▮

## EXHIBIT "A"

THAT CERTAIN LOT OR PORTION OF GROUND, situated in the Parish of St.
Tammany, Stated of Louisiana, in that part thereof known as EDEN ISLES
SUBDIVISION, UNIT 5, PHASE 1, being LOT NUMBER THIRTY-SEVEN (37),
according to a map or plat of survey by Albert A. Lovell, C.E., dated May 22,
1974, formerly map or plat file No. 1702, now map or plat file no. 98A, 98B, and
98D of the official records of St. Tammany Parish, Louisiana. said property is
further delineated on plat of survey No. 77-070 by Albert A. Lovell, C.E., dated
September 6, 1976, and revised April 14, 1977.


Marital Status: BRIAN J. DOMINGUE, married to Michelle Benton Domingue ,
dealing with seperate property,

**State of LOUISIANA**
**Parish of ST. TAMMANY**

### NOTARIAL ENDORSEMENT AND
### ASSIGNMENT OF MORTGAGE

**Loan No** ▮▮▮▮▮▮
**Mips Loan N** ▮▮▮▮▮▮
**New Servicer Loan No** ▮▮▮▮▮▮
**Investor Loan No** ▮▮▮▮▮▮

Be it known that on _____ **DEC 1 3 2013** 2013 (MM/DD/YYYY), before me, the undersigned Notary Public in and
for the State of TEXAS, County of TRAVIS, personally came and appeared
_____ Wendy Traxler, First Vice President _____ of ONEWEST
**BANK, FSB, WHOSE ADDRESS IS 888 E. WALNUT STREET, PASADENA, CA, 91101, (ASSIGNOR),**
and who, upon appearing on behalf of the said Assignor and duly authorized by the governing body of said
Assignor, declared:

That for value received, the said **ONEWEST BANK, FSB** does hereby assign, transfer, and deliver, without
recourse, to: **OCWEN LOAN SERVICING, LLC, A DELAWARE LIMITED LIABILITY COMPANY,**
**WHOSE ADDRESS IS 3451 HAMMOND AVENUE, WATERLOO, IA 50702 (319)236-5291, ITS**
**SUCCESSORS AND ASSIGNS, (ASSIGNEE)** one certain mortgage made and subscribed by **BRIAN J.**
**DOMINGUE AND MICHELLE BENTON DOMINGUE** which is described herein, executed by the same
parties, and so paraphed by a Notary Public, on 03/31/2006 recorded under Registry 1545553 and/or in Book  at
Page , covering property known as , , situated in ST. TAMMANY Parish and more particularly described in such
mortgage. .

SEE EXHIBIT A ATTACHED

That the said "Assignor" is the legal and equitable owner of the Mortgage with full power to assign the same;
that it has executed no prior assignment or pledge thereof; that it has executed no release, discharge, satisfaction
or cancellation of said Mortgage; that it has executed no release of any portion of any of the security described in
said Mortgage; and, that it has executed no instrument of any kind affecting the Mortgage or the liability of the
maker or makers thereof.

OWBAV ▮▮▮▮▮▮

St. Tammany Parish 2277
Instrmnt #: 1928501
Registry #: 2282390 bvs
1/10/2014 8:30:00 AM
MB X CB   MI   UCC

**Loan No** ████████
**Mips Loan** ████████
**New Servicer Loan N**███
**Investor Loan N**████████

This signed in my office, in the aforementioned County and State, on the date first hereinabove written, in the presence of the undersigned competent witnesses, who have signed with said appearer and me, Notary, after due reading of the whole.

Dated on **DEC 13 2013** /2013 (MM/DD/YYYY)
ONEWEST BANK, FSB

By:_____

_____
      Wendy Traxler, First Vice President

_____
            Carla Smith          WITNESS

_____
        Mary A. Fulton           WITNESS

STATE OF TEXAS
COUNTY OF TRAVIS          **DEC 13 2013**
Before me, a Notary Public, on _____/_____/2013 (MM/DD/YYYY), personally appeared _____Wendy Traxler_____, known to me to be the person whose name is subscribed to the foregoing instrument as _____First Vice President_____ of ONEWEST BANK, FSB and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

_____
            Judith L. Probst
Notary Public - State of TEXAS
Commission expires:
        **JAN 30 2015**

```
JUDITH L. PROBST
NOTARY PUBLIC
State of Texas
Comm. Exp. 01-30-2015
```

Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

When Recorded Return To:
One West Bank, FSB
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

OWBAV ████████

'EXHIBIT A'

THAT CERTAIN LOT OR PORTION OF GROUND, SITUATED IN THE PARISH OF ST. TAMMANY, STATE OF LOUISIANA, IN THAT PART THEREOF KNOWN AS EDEN ISLES SUBDIVISION, UNIT 5, PHASE 1, BEING LOT NUMBER THIRTY-SEVEN (37), ACCORDING TO A MAP OR PLAT OF SURVEY BY ALBERT A. LOVELL, C.E., DATED MAY 22, 1974, FORMERLY MAP OR PLAT FILE NO. 1702, NOW MAP OR PLAT FILE NO. 98A, 98B, AND 98D OF THE OFFICIAL RECORDS OF ST. TAMMANY PARISH, LOUISIANA, SAID PROPERTY IS FURTHER DELINEATED ON PLAT OF SURVEY NO. 77-070 BY ALBERT A. LOVELL, C.E., DATED SEPTEMBER 6, 1976, AND REVISED APRIL 14, 1977.

State of <u>LOUISIANA</u>
Parish of <u>ST. TAMMANY</u>

## NOTARIAL ENDORSEMENT AND ASSIGNMENT OF MORTGAGE

Be it known that on ___/___ 20 /2017 (MM/DD/YYYY), before me, the undersigned Notary Public in and for the State of FLORIDA, County of PINELLAS, personally came and appeared **Shannon McKinney**, Vice President of Loan Documentation of **NATIONSTAR MORTGAGE LLC** as Attorney-in-Fact for **OCWEN LOAN SERVICING, LLC, WHOSE ADDRESS IS C/O NATIONSTAR MORTGAGE LLC, 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019, (ASSIGNOR)**, and who, upon appearing on behalf of the said Assignor and duly authorized by the governing body of said Assignor, declared:

That for value received, the said **OCWEN LOAN SERVICING, LLC, by NATIONSTAR MORTGAGE LLC, its Attorney-in-Fact** does hereby assign, transfer, and deliver, without recourse, to: **NATIONSTAR MORTGAGE LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS NATIONSTAR MORTGAGE LLC, 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019 (816)854-4202, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE)** one certain mortgage made and subscribed by **BRIAN J. DOMINGUE AND MICHELLE BENTON DOMINGUE** which is described herein, executed by the same parties, and so paraphed by a Notary Public, on 03/31/2006 recorded under <u>Instrument # 1545553</u>.

SEE ATTACHED EXHIBIT A

That the said "Assignor" is the legal and equitable owner of the Mortgage with full power to assign the same; that it has executed no prior assignment or pledge thereof; that it has executed no release, discharge, satisfaction or cancellation of said Mortgage; that it has executed no release of any portion of any of the security described in said Mortgage; and, that it has executed no instrument of any kind affecting the Mortgage or the liability of the maker or makers thereof.

NSBT █████████ OCWENROSE

St. Tammany Parish 2017
Instrment #: 2051736
Registry #: 2475415 Jam
1/30/2017 8:30:00 AM
MB X CB    MI    UCC

This signed in my office, in the aforementioned County and State, on the date first hereinabove written, in the presence of the undersigned competent witnesses, who have signed with said appearer and me, Notary, after due reading of the whole.

Dated on ___/___/2017 (MM/DD/YYYY)
**OCWEN LOAN SERVICING, LLC, by NATIONSTAR MORTGAGE LLC, its Attorney-in-Fact**

By:_____
   **Shannon McKinney**
   **Vice President of Loan Documentation**
All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

_____
Jeanette Roikes      WITNESS

_____
Stacey Giaquinto      WITNESS

STATE OF FLORIDA
COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on ___/___/2017 (MM/DD/YYYY), by Shannon McKinney as Vice President of Loan Documentation of NATIONSTAR MORTGAGE LLC as Attorney-in-Fact for OCWEN LOAN SERVICING, LLC, who, as such Vice President of Loan Documentation being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
Michelle Brown
Notary Public - State of FLORIDA
Commission expires: 10/13/2020

MICHELLE BROWN
Notary Public - State of Florida
My Commission #GG 38514
Expires October 13, 2020

**Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**

When Recorded Return To:
Nationstar Mortgage LLC
C/O Nationwide Title Clearing, Inc. 2100 Alt. 19 North
Palm Harbor, FL 34683

NSBT

# Exhibit A

THAT CERTAIN LOT OR PORTION OF GROUND, situated in the Parish of St. Tammany, Stated of Louisiana, in that part thereof known as EDEN ISLES SUBDIVISION, UNIT 5, PHASE 1, being LOT NUMBER THIRTY-SEVEN (37), according to a map or plat of survey by Albert A. Lovell, C.E., dated May 22, 1974, formerly map or plat file No. 1702, now map or plat file no. 98A, 98B, and 98D of the official records of St. Tammany Parish, Louisiana, said property is further delineated on plat of survey No. 77-070 by Albert A. Lovell, C.E., dated September 6, 1976, and revised April 14, 1977.